IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Frank Bush, | ) | C/A No.: 1:14-4917-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This pro se appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On November 2, 2010, Plaintiff filed an application for SSI in which he alleged his disability began on March 1, 2001. Tr. at 175–80. His application was denied initially and upon reconsideration. Tr. at 108–11, 114–15. On May 30, 2013, Plaintiff had a

hearing before Administrative Law Judge ("ALJ") William F. Pope. Tr. at 23–48 (Hr'g Tr.). The ALJ issued an unfavorable decision on July 15, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 5–22. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on December 31, 2014. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 55 years old at the time of the hearing. Tr. at 28. He completed high school. Tr. at 29. He had no past relevant work ("PRW"). Tr. at 38. He alleges he has been unable to work since March 1, 2001.[1] Tr. at 175.

2.    Medical History

Plaintiff presented to the emergency room ("ER") at Palmetto Health Richland on December 13, 2009, complaining of abdominal pain. Tr. at 278. He admitted to drinking heavily the night before and to drinking on a regular basis. Tr. at 278–79. The physician prescribed a gastrointestinal ("GI ") cocktail, and Plaintiff's abdominal pain resolved. Tr. at 279. The physician diagnosed Plaintiff with alcoholic gastritis and alcohol intoxication and instructed him to limit his alcohol intake and to take Zantac for 30 days. *Id.*

---

[1] Although Plaintiff alleges he became unable to work on March 1, 2001, the earliest possible established onset date in his claim is November 2, 2010—his application filing date. SSA POMS DI 25501.370(A)(1).

Plaintiff was hospitalized at Palmetto Health Richland from February 5 to February 11, 2010, after sustaining a trauma. Tr. at 253–55. He was noted to be intoxicated upon admission to the ER. Tr. at 256. He reported that he was assaulted from behind while walking down the road. Tr. at 248. However, a consultation note from Stephen Fann, M.D., indicates Plaintiff was struck by an automobile while walking. Tr. at 251. Plaintiff's diagnoses included left forehead hematoma, right occipital scalp laceration, hypothermia, altered consciousness, traumatic brain injury ("TBI") with subdural hemorrhage, nasal fracture, and mild bilateral arm weakness. Tr. at 253. A computed tomography ("CT") scan of Plaintiff's cervical spine showed mild cervical spondylosis, but no acute cervical spinal fracture. Tr. at 264. Magnetic resonance imaging ("MRI") of Plaintiff's cervical spine demonstrated no evidence of cord contusion or epidural hematoma in the cervical region; mild-to-moderate disc osteophyte complex at C3-4 that was eccentric to the right, with slight right foraminal narrowing; mild central disc osteophyte complex at C4-5, with mild right foraminal narrowing; a slight broad-based disc osteophyte complex at C5-6; and a mild central disc osteophyte complex at C6-7. Tr. at 282. A CT scan of Plaintiff's facial bones indicated nasal bone fractures and a fracture of the anterior squamous portion of the left temporal bone with extension into the sphenoid bone and central aspect of the left orbital roof, with resultant extraconal hematoma and left globe proptosis. Tr. at 268. A CT scan of Plaintiff's head showed a minute left subdural hematoma and cortical hemorrhagic contusions along the left temporal lobe, a fracture of the anterior squamous portion of the left temporal bone, and a soft tissue scalp hematoma along the left anterolateral scalp and right posterolateral scalp.

Tr. at 270. The discharge summary notes that Plaintiff complained of inability to use his hands, but was observed by nursing staff to be feeding himself and using his hands without difficulty. Tr. at 254. Greg S. Swartzentruber, M.D. ("Dr. Swartzentruber"), stated a physical exam showed no evidence of upper extremity weakness and that Plaintiff had good grip strength and normal sensation bilaterally. *Id.* He indicated Plaintiff had refused to leave after being discharged because he stated that his 85-year-old mother could not take care of him. *Id.* Dr. Swartzentruber suggested that Plaintiff was capable of meeting his own needs because he was seen "ambulating around the entire length of the seventh floor" and feeding himself when he was not aware that he was being watched. *Id.*

Plaintiff followed up with Brenda E. Stokes, RN ("Ms. Stokes"), at Orthopaedic Center on February 17, 2010. Tr. at 362. He complained of pain in his head, neck, and shoulder. Tr. at 364. Ms. Stokes observed Plaintiff to have full range of motion ("ROM"), normal strength, and no localized tenderness or swelling. Tr. at 365. She removed the staples from Plaintiff's posterior scalp, refilled Lortab, and prescribed Valium for neck and shoulder pain. *Id.*

On March 8, 2010, a head CT showed resolution of the left-sided middle cranial fossa and frontal lobe subdural hematoma; slight residual soft tissue swelling of the left temporal soft tissues; healing fractures of the left zygomatic arch and maxilla; and minimal left sphenoid and right ethmoid sinus disease. Tr. at 283.

Plaintiff presented to the ER at Palmetto Health Richland on March 16, 2010, complaining of a rash. Tr. at 285. He indicated that he had developed the rash two days

4

earlier and denied trying new food, soap, or detergent. *Id.* Derick M. Wenning, M.D. ("Dr. Wenning"), prescribed steroids and antihistamines. Tr. at 286.

On March 23, 2010, Plaintiff presented to Ginny L. Gottschalk, M.D. ("Dr. Gottschalk"), at Palmetto Health Richland Family Medicine Center with a complaint of chronic head and shoulder pain. Tr. at 358–59. He reported that his hands were always cold and painful. Tr. at 359. Plaintiff indicated he was unable to open his jaw and insisted that it had been broken, but Dr. Gottschalk reviewed the CT scan and informed Plaintiff that his jaw was not fractured. Tr. at 359–60. Plaintiff became upset and said he'd been lied to about his jaw and that he was going to contact his lawyer. Tr. at 360. Plaintiff demonstrated 4/5 strength and decreased ROM in his bilateral upper extremities, but Dr. Gottschalk described his effort as poor. Tr. at 361. She stated Plaintiff was mildly hostile and moderately agitated. *Id.* She prescribed a one-month supply of Plaintiff's medications, referred him to physical therapy, and discharged him from the practice. Tr. at 361.

Plaintiff presented to Stephanie Chapman, DO ("Dr. Chapman"), at Internal Medicine Center on April 2, 2010, complaining of pain and numbness in his bilateral upper extremities. Tr. at 354. He indicated he had difficulty opening his jaw fully, experienced constant numbness from his elbows to his fingers, and had occasional pain and weakness in his hands. *Id.* Dr. Chapman observed that Plaintiff was unable to open his jaw fully on the left. Tr. at 355. She noted that Plaintiff had 4/5 strength proximally and distally and decreased ROM to about 120 degrees in his bilateral upper extremities, but she stated that Plaintiff gave "very poor effort." *Id.* Dr. Chapman referred Plaintiff to

dental care and physical therapy and ordered nerve conduction studies. Tr. at 356. She prescribed Neurontin and Ultram and instructed Plaintiff to follow up in two weeks. *Id.*

On April 12, 2010, an electromyography ("EMG") showed Plaintiff to have mild bilateral carpal tunnel syndrome. Tr. at 461. The physician who administered the EMG stated that he believed Plaintiff's main problems were musculoskeletal. *Id.*

Plaintiff followed up with Dr. Chapman on April 14, 2010. Tr. at 349. He endorsed pain and numbness in his bilateral shoulders and indicated his upper extremities were cold from his elbows to his fingers. *Id.* He stated his pain increased when he was lying down and that the numbness and cold feeling increased when he flexed at the elbows. *Id.* Plaintiff endorsed little improvement with Ultram and Neurontin. *Id.* Dr. Chapman observed that Plaintiff was unable to open his jaw beyond 15 to 20 millimeters. Tr. at 350. She described Plaintiff's judgment as impaired, but noted no additional abnormalities on physical or mental examinations. Tr. at 350–51. She instructed Plaintiff to continue taking Ultram and to make another appointment with physical therapy. Tr. at 351. She increased Plaintiff's dosage of Neurontin to 300 milligrams three times a day. *Id.*

On April 28, 2010, Plaintiff presented to Seejil S. Dan, M.D. ("Dr. Dan"), at Internal Medicine Center. Tr. at 344. He complained of persistent left-sided facial pain. *Id.* He endorsed continued shoulder pain, but indicated it had improved with pain medication and physical therapy. *Id.* He stated he was unable to fully open his mouth, but could not afford to visit an oral surgeon. *Id.* Dr. Dan observed that Plaintiff was unable to

fully open his jaw, but noted no other abnormalities on the physical examination. Tr. at 346.

Plaintiff presented to Narmadha Kalyanaswamy, M.D. ("Dr. Kalyanaswamy"), at Internal Medicine Center on May 20, 2010. Tr. at 340. He endorsed pain in his head, shoulders, and hands that was not controlled by Tramadol. *Id.* He indicated he was unable to open his mouth completely, but could not see an oral surgeon because he lacked insurance. *Id.* Dr. Kalyanaswamy observed no abnormalities on physical examination. Tr. at 341. She indicated Plaintiff had "[n]o obvious tenderness or restriction of motion in cervical spine/shoulders on exam." Tr. at 342. She instructed Plaintiff to take non-steroidal anti-inflammatory drugs ("NSAIDs"), as needed and increased his dosage of Tramadol to 100 milligrams twice a day. *Id.*

Plaintiff followed up with Dr. Kalyanaswamy on July 15, 2010. Tr. at 335. He endorsed right shoulder pain that he described as "aching" and rated as a nine on a 10-point scale. Tr. at 339. Dr. Kalyanaswamy indicated Plaintiff's blood pressure was 193/125 on the first assessment and remained elevated on repeat measurements. Tr. at 335. Dr. Kalyanaswamy noted no other abnormalities on physical examination. Tr. at 336–37. She increased Plaintiff's dosage of Lisinopril to 40 milligrams, added 10 milligrams of Norvasc, and instructed him to return the following day for a blood pressure check. Tr. at 337.

On July 16, 2010, Plaintiff presented to Christopher L. Walker, M.D. ("Dr. Walter"), at Internal Medicine Center. Tr. at 330. Plaintiff complained of right shoulder pain. *Id.* Dr. Walker indicated that Plaintiff was participating in physical therapy and that

he had recently increased Plaintiff's dosage of Ultram from 50 to 100 milligrams. *Id.* Plaintiff stated he had been unable to afford the 100 milligram tablets, and Dr. Walker instructed him on where he could go to get his medications for less. *Id.* Plaintiff endorsed paresthesias in his bilateral arms, but indicated the problem had improved with Gabapentin.[2] *Id.* Dr. Walker observed that Plaintiff was unable to fully open his jaw and had pain with palpation of his right shoulder, decreased ROM in his right upper extremity, and 4/5 strength in his right shoulder. Tr. at 332. The physical examination was otherwise normal, and Dr. Walker described Plaintiff as having intact judgment; being oriented to time, place, and person; having intact memory for recent and remote events; and showing no signs of depression, anxiety, or agitation. Tr. at 333.

Plaintiff was hospitalized at Palmetto Health Richland from July 28, 2010, to August 5, 2010. Tr. at 297. The physicians treated him conservatively for three days, and Plaintiff's symptoms improved. *Id.* However, he continued to complain of vague left periumbilical and left lower quadrant pain. *Id.* The physicians administered a GI series and small bowel follow-through ("SBFT") study that showed a partial small bowel obstruction. *Id.* They recommended Plaintiff undergo an exploratory laparoscopy, but Plaintiff did not understand the situation or procedure. Tr. at 297–98. The medical team requested to speak with Plaintiff's family members, but Plaintiff refused to give them permission. Tr. at 298. The medical team indicated that they intended to speak with

---

[2] According to the U.S. National Library of Medicine, a service of the National Institutes of Health, Gabapentin is the generic drug that generally carries the brand name of Neurontin. *Gabapentin*, Medline Plus, https://www.nlm.nih.gov/medlineplus/druginfo/meds/ a694007.html.

Plaintiff's family members despite his refusal, but that no family members were available at the hospital. *Id.* Plaintiff was subsequently discharged without undergoing the exploratory laparoscopy. *Id.* Eun-Yeong Oh, M.D., expressed concern that the lesion on the SBFT study represented a partial area of obstruction that may recur in the future. *Id.*

Plaintiff followed up with Greg M. Talente, M.D. ("Dr. Talente"), at Internal Medicine Center on August 16, 2010. Tr. at 326. Dr. Talente observed no abnormalities on examination. Tr. at 327. He noted that Plaintiff's blood pressure was not well-controlled and prescribed Metaprolol 25 milligrams. Tr. at 327, 328. He indicated he would refer Plaintiff for a kidney ultrasound if his blood pressure failed to improve by the next visit. Tr. at 328.

On September 13, 2010, Plaintiff presented to Eric Y. Marom, M.D. ("Dr. Marom"), at Internal Medicine Center with concerns about his blood pressure. Tr. at 323. Dr. Marom noted that Plaintiff was taking 25 milligrams of Hydrochlorothiazide, 10 milligrams of Norvasc, 40 milligrams of Lisinopril, and 25 milligrams of Metoprolol to treat hypertension. *Id.* Plaintiff requested that he be referred for a colonoscopy. *Id.* Dr. Marom noted no abnormalities on examination. Tr. at 323–24. He indicated Plaintiff had a strong family history of colon cancer and that he would attempt to help Plaintiff obtain funding for a colonoscopy. Tr. at 324. He stated Plaintiff's slightly elevated blood pressure was likely caused by his three-mile walk to the clinic and that Plaintiff should continue taking the same medications. *Id.* He changed Plaintiff's medications to 90-day supplies because of Plaintiff's difficulties obtaining transportation to medical appointments and the pharmacy. *Id.*

Plaintiff followed up with Dr. Kalyanaswamy on November 11, 2010. Tr. at 318. He endorsed hand numbness and tingling, but indicated it was relieved by Neurontin. *Id.* He requested a referral to physical therapy for bilateral shoulder pain. *Id.* Dr. Kalyanaswamy noted Plaintiff's hypertension was well-controlled on his current medications. *Id.* She observed no abnormalities on examination. Tr. at 319.

Plaintiff presented to the ER at Palmetto Health Richland on November 28, 2010, with a skin rash on his head and upper extremities. Tr. at 392. Dr. Wenning diagnosed contact dermatitis, prescribed oral steroids, and referred Plaintiff to a dermatologist. Tr. at 393.

State agency consultant Edward Waller, Ph. D., completed a psychiatric review technique form on December 2, 2010, and considered Listings 12.02 for organic mental disorders and 12.09 for substance addiction disorders. Tr. at 367. He indicated Plaintiff had memory loss, but no medically-determinable organic mental impairment. Tr. at 368. He found that Plaintiff engaged in drug and alcohol abuse. Tr. at 375. He assessed Plaintiff as having mild difficulties in maintaining social functioning, but having no restriction of activities of daily living; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. Tr. at 377.

State agency medical consultant James Haynes, M.D. ("Dr. Haynes"), completed a physical residual functional capacity ("RFC") assessment on December 22, 2010, and found that Plaintiff was limited as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk about six hours in an eight-hour

workday; sit for a total of about six hours in an eight-hour workday; and occasionally climb ladders/ropes/scaffolds. Tr. at 381–88.

Plaintiff followed up with Dr. Kalyanaswamy on March 3, 2011, for hypertension and radiculopathy. Tr. at 444. His blood pressure was elevated at 164/100 and remained elevated on repeated checks. *Id.* He indicated his hand numbness and tingling was reduced by his current dosage of Neurontin, but that it was not completely remedied. *Id.* Dr. Kalyanaswamy observed no abnormalities on examination. Tr. at 445. She confirmed with Plaintiff's pharmacy that he had been filling his four blood pressure medications on time. Tr. at 446. She discontinued Metoprolol and prescribed Labetelol for hypertension and increased Neurontin to 400 milligrams twice a day. *Id.*

Plaintiff presented to the ER at Palmetto Health Richland on March 10, 2011, complaining of a possible stroke. Tr. at 399. He reported a brief loss of consciousness and slurred speech after he fell while walking from his bed to the bathroom. *Id.* Edward J. Krusling, M.D. ("Dr. Krusling"), observed that Plaintiff's speech was slurred and that he smelled strongly of alcohol. *Id.* However, Plaintiff specifically denied use of alcohol. *Id.* Dr. Krusling's diagnostic impression was alcohol intoxication with fall. Tr. at 400. He recommended Plaintiff pursue treatment for alcohol abuse, but stated Plaintiff was not interested in following through with treatment. *Id.*

Plaintiff followed up with Dr. Kalyanaswamy on June 2, 2011. Tr. at 440. Dr. Kalyanaswamy noted that Plaintiff's blood pressure was elevated at 154/89. *Id.* Plaintiff reported hand numbness and tingling, but stated it was relieved by Neurontin. *Id.* Dr. Kalyanaswamy counseled Plaintiff to avoid alcohol abuse. Tr. at 442. She indicated she

would hold off on increasing Plaintiff's blood pressure medication because she was doubtful of his medication compliance. Tr. at 441–42.

Plaintiff presented to Hsaio C. Liu, M.D. ("Dr. Liu"), on July 21, 2011, complaining of a cold feeling and numbness in his bilateral hands. Tr. at 434. He complained of occasional poor grip strength and difficulty holding a steering wheel. *Id.* Plaintiff indicated that he drank three beers per day, and Dr. Liu advised him to quit or cut down. *Id.* Dr. Liu observed no abnormalities on physical examination. Tr. at 435. He indicated that Plaintiff's neurological examination was benign and failed to reveal any deficits. Tr. at 436. He scheduled Plaintiff for an MRI and increased his dosage of Gabapentin to 800 milligrams, three times a day. *Id.*

On July 29, 2011, an MRI of Plaintiff's cervical spine showed multilevel changes of cervical spondylosis without evidence of any disc protrusion or significant central stenosis. Tr. at 419. It indicated some mild foraminal encroachment on the right side at the C3-4 and C4-5 levels. *Id.*

Plaintiff presented to Cristina Lara-Castro, M.D. ("Dr. Lara-Castro"), on August 29, 2011. Tr. at 430. He complained of stiffness. *Id.* Dr. Lara-Castro observed that Plaintiff had no pain upon palpation of his spine and normal strength and ROM of both upper extremities, but noted that he had decreased grip strength in both hands. *Id.* She discussed with Plaintiff the results of his cervical MRI and indicated she did not consider it necessary to refer him to a neurosurgeon. Tr. at 431. She recommended that Plaintiff try the increased dose of Neurontin and follow up in one month. *Id.*

12

Plaintiff followed up with Dr. Liu regarding his MRI results on September 29, 2011. Tr. at 426. He continued to complain of numbness and a cold feeling in his hands and shoulders. *Id.* Dr. Liu indicated that the MRI showed no cervical stenosis or significant encroachment. Tr. at 427. He instructed Plaintiff that surgery was not a good option and that he should continue to take Gabapentin. *Id.* Dr. Liu consulted with Davinder Lilly, M.D. ("Dr. Lilly"). Tr. at 428. Dr. Lilly concluded that Plaintiff was not a surgical candidate because his neurological examination was significant for sensory loss, but not motor loss. *Id.*

Plaintiff followed up with Dr. Liu on March 8, 2012. Tr. at 421. He stated he had not taken his blood pressure medication in two weeks, but reported improvement in his arm and hand pain with Gabapentin. *Id.* Plaintiff's blood pressure was elevated, but Dr. Liu observed no other abnormalities on physical examination. Tr. at 421–22. Dr. Liu refilled Plaintiff's medications, but discontinued Ultram because Plaintiff indicated he was not taking it. Tr. at 422. He instructed Plaintiff to follow up for a blood pressure check in one week. *Id.*

On August 23, 2012, Plaintiff's physician[3] completed several opinion statements. Tr. at 462–68. She indicated she had diagnosed Plaintiff with cervical spine radiculopathy and that she was medically managing his pain. Tr. at 462. She specified that Plaintiff's condition was not related to alcohol or drug use and noted that Plaintiff was not likely to

---

[3] The physician's signature is illegible, but Plaintiff indicated at the hearing that his doctor had completed the statements and that he had recently found them in his house. Tr. at 40–41. Plaintiff suggested that his doctor was a woman, but did not identify her by name. Tr. at 41.

fully recover. *Id.* She indicated that Plaintiff suffered from pain in his arms and hands, but that his pain was not severe enough to affect his ability to concentrate. Tr. at 463. She stated that Plaintiff's pain could have an unpredictable onset and interfere with his activities of daily living and ability to use his hands. Tr. at 465. She indicated that Plaintiff's condition was severe enough to cause him to miss work about three times a month. *Id.* She stated that Plaintiff's condition had lasted for 12 months or was expected to continue for 12 months at the specified level of severity. Tr. at 466. Plaintiff's physician also completed a physical capacities evaluation and assessed Plaintiff as having the following abilities: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push and/or pull limited in upper extremities. Tr. at 467. Plaintiff's physician explained that the limitation in Plaintiff's abilities to push and pull was secondary to cervical radiculopathy with sensory changes to hands with decreased grip strength due to pain. *Id.* She also indicated Plaintiff had neurologic pain. Tr. at 468.

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on May 30, 2013, Plaintiff testified that he was unable to work because of problems with his arms, shoulders, and feet. Tr. at 30. He endorsed pain and weakness in his left hand, shoulder, and leg. Tr. at 31. He indicated he experienced pain in his bilateral hips. *Id.* He stated he was taking Gabapentin. *Id.*

14

Plaintiff testified that he rode a bus for approximately ten minutes and then walked an additional 20 to 25 minutes to the hearing office. Tr. at 29, 31. He stated he had to wear special shoes because of a problem with his ankle. Tr. at 32. He indicated he needed to stop and rest for four or five minutes after walking for about a tenth of a mile. *Id.*

Plaintiff denied using alcohol and indicated that he had never had a problem with alcohol abuse. Tr. at 34. He stated that he had not used any illegal drugs. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") Robert E. Brabham, Ph. D., reviewed the record and testified at the hearing. Tr. at 36. The VE stated Plaintiff had no PRW that would be classified as substantial gainful activity. Tr. at 38. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work that required no lifting or carrying over 50 pounds occasionally and 25 pounds frequently; no standing and/or walking over six hours in an eight-hour workday; and no more than occasional climbing of ladders or scaffolds. *Id.* The ALJ asked whether there were any jobs in the regional or national economy that the hypothetical person could perform. Tr. at 38–39. The VE identified medium, unskilled jobs as a janitor, *Dictionary of Occupational Titles* ("*DOT*") number 323.687-010, with 400,000 positions in the national economy and a machine tender, *DOT* number 619.685-030, with 160,000 positions in the national economy. Tr. at 39.

After reviewing the physician's statement, the ALJ described to the VE a hypothetical individual of Plaintiff's vocational profile who was limited to performing work that required no lifting or carrying over 20 pounds occasionally and 10 pounds

frequently; no standing and/or walking over six hours in an eight-hour workday; no climbing of ladders or scaffolds; no more than occasional use of foot pedals or other controls with the lower extremities; and no exposure to unprotected heights, vibration, or machinery with exposed hazardous moving parts. Tr. at 42. The ALJ asked whether there were any jobs in the regional or national economy that the hypothetical person could perform. Tr. at 43. The VE testified that the individual could perform light jobs as a machine operator, *DOT* number 524.685-038, with 400,000 positions in the national economy and a production inspector, *DOT* number 361.687-022, with 200,000 positions in the national economy. *Id.*

> ## 2.  The ALJ's Findings

In his decision dated July 15, 2013, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant has not engaged in substantial gainful activity since November 2, 2010, the application date (20 CFR 416.971 *et seq.*).
2.  The claimant has the following severe impairments: cervical spine spondylosis with radiculopathy, and episodic hand numbness (20 CFR 416.920(c)).
3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
4.  After review of the total evidence of record, and in consideration of the combined effect of the claimant's impairments, including all severe impairments, non-severe impairments and subjective complaints, I find that the claimant has retained the residual functional capacity to perform work with restrictions that require: no lifting or carrying over 50 pounds occasionally and 25 pounds frequently; with no standing and/or walking over six hours in an eight-hour workday; and with no more than occasional climbing of ladders or scaffolds.
5.  The claimant has no past relevant work (20 CFR 416.965).
6.  The claimant was born on June 5, 1957, and was 53 years old, which is defined as an individual closely approaching advanced age, on the date the

application was filed. The claimant subsequently changed age category to advanced age (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since November 2, 2010, the date the application was filed (20 CFR 416.920(g)).

Tr. at 10–18.

## II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ did not adequately consider Plaintiff's inability to afford adequate medical treatment;

2)  the ALJ failed to refer Plaintiff for a consultative examination; and

2)  the ALJ's decision was not supported by substantial evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A.  Legal Framework

#### 1.  The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

17

expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings

of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.      Analysis

1.      Inability to Afford Adequate Treatment

Plaintiff argues that the ALJ did not adequately consider that he was unable to afford his medications, medical visit co-pays, or copies of his medical records. [ECF No.

20

47 at 1]. The Commissioner maintains that the ALJ adequately assessed Plaintiff's credibility. [ECF No. 48 at 16–19].

An individual's medical treatment history is one of the factors that an ALJ may consider in assessing his credibility. SSR 96-7p. However, "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7; *see also* 20 C.F.R. § 416.930. Fourth Circuit precedent directs that ALJs may not deny benefits to claimants who lack the financial resources to obtain treatment. *See Lovejoy v. Heckler,* 790 F.2d 1114, 1117 (4th Cir.1986) (holding that the ALJ erred in determining that the plaintiff's impairment was not severe based on her failure to seek treatment where the record reflected that she could not afford treatment); *Gordon v. Schweiker,* 725 F.2d 231, 237 (4th Cir.1984) ("it flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him"). When a claimant alleges an inability to afford treatment and an ALJ considers the failure to obtain treatment as a factor that lessens the claimant's credibility, the ALJ must make specific findings regarding the claimant's ability to afford treatment. *See Dozier v. Colvin*, C/A No. 1:14-29-DCN, 2015 WL 4726949, at *4 (D.S.C. Aug. 10, 2015) (remanding the case because the ALJ did not include specific factual findings regarding the resources available to the plaintiff and whether "her failure to seek additional medical treatment was based upon her alleged inability to pay").

21

The undersigned's review of the record yields no evidence to suggest that the ALJ reduced Plaintiff's credibility based on an absence of medical treatment. The ALJ cited multiple findings to support his credibility assessment, but neither the absence of medical treatment, nor noncompliance with recommended treatment was among them. *See* Tr. at 11 (noting that "clear signs of exaggeration" during Plaintiff's hospitalization in February 2010 significantly reduced his credibility), 12 (observing that Plaintiff's physicians' notes typically described him as "not appearing in any particular distress" and "the clinical picture reflected in the treatment record shows limited objective findings to support the degree of continuing limitations asserted by the claimant"), 13 (stating Plaintiff's "lack of honesty about his alcohol intake reduces his credibility"), 14 (finding that Plaintiff's sporadic employment history did not bolster his allegations) 15–16 (concluding that Plaintiff's ADLs were "indicative of a fairly active and varied lifestyle and are not representative of a significant restriction of activities or constriction of interests"), 16 (pointing out that Plaintiff never complained to his physicians of side effects from medications; observing that Plaintiff demonstrated no discomfort during the hearing). Because the ALJ did not cite a lack of medical treatment or noncompliance with medical treatment to support his credibility finding, it was not necessary for him to make specific findings regarding Plaintiff's ability to afford treatment. Thus, the undersigned recommends the court find that the ALJ did not err in failing to consider Plaintiff's allegation that he was unable to afford treatment and medications.

2.    Duty to Develop the Record

Plaintiff argues that he repeatedly requested that he be referred for a consultative examination.[6] [ECF No. 47 at 2]. He also contends that he was unable to afford an attorney. *Id.* at 1.

The Commissioner maintains that the ALJ did not err in failing to refer Plaintiff for a consultative examination because he determined that the record contained sufficient evidence to assess Plaintiff's RFC. [ECF No. 48 at 21–22].

Because Plaintiff is proceeding pro se, the court is charged with liberally construing his brief to allow for the development of a potentially meritorious claim. *See Boag v. MacDougall*, 454 U.S. 364, 365 (1982); *see also Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999) (stating that the mandated liberal construction of pro se pleadings means only that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so). Therefore, the undersigned considers it necessary to look not only to whether the ALJ should have referred Plaintiff for a consultative examination, but also to the larger question of whether the ALJ adequately discharged his duty to develop the record.

The Social Security Administration ("SSA") recognizes a claimant's right to be represented by an attorney or other qualified representative. 20 C.F.R. §§ 416.1500, 416.1505. However, "[t]he mere absence of counsel is not grounds for reversal or remand, so long as the claimant receives a full and fair hearing of his claim." *Perrotta ex*

---

[6] A review of the hearing transcripts does not support Plaintiff's argument that he requested he be referred for a consultative examination, but it does reflect requests for continuances to obtain representation and additional records. *See* Tr. at 23–48, 49–104.

*rel. S. J. P. v. Astrue*, No. 2:10-627, 2012 WL 503042, at \*7 (E.D. Va. Jan. 18, 2012), citing *Sims v. Harris*, 631 F.2d 26, 27–28 (4th Cir. 1980). In *Cullison v. Califano*, 613 F.2d 55, 58 (4th Cir. 1980), the court declined to create a rule requiring that ALJs provide special notice that they should retain counsel to claimants whose records suggested that they may have some degree of mental or emotional instability. However, the court stated the following:

> [C]onsistent with the purpose of the truth-finding claims procedure created by Congress for the compensation of bona fide disabilities, the Secretary's rules and the conduct of various adjudicatory proceedings—before the Secretary and on review—must take special account of any impairment which can effectively disable a claimant from substantiating her claim— whether it arises by claimant's inability to submit to a medical treatment, her testimonial declarations or her failing attempts at self-preservation.

*Cullison*, 613 F.2d at 58 (citations omitted).

The ALJ is required to "inquire fully into each issue" and "is held to a high standard in discharging this fact-finding requirement." *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980). "The performance of this duty is particularly important when a claimant appears without the assistance of counsel." *Id.* "Under such circumstances, the ALJ should 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts,' being 'especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited.'" *Id.*, citing *Gold v. Secretary of Health, Education and Welfare*, 463 F.2d 38, 43 (2nd Cir. 1972); *Rosa v. Weinberger*, 381 F. Supp. 377, 381 (E.D.N.Y. 1974). Thus, ALJs have a heightened duty to develop the record in cases involving pro se claimants.

Pursuant to 20 C.F.R. § 416.912(d), the ALJ must develop the claimant's complete medical history for at least the 12 months preceding the month in which the claimant filed his application. The ALJ is to "make every reasonable effort" to help the claimant obtain medical records from his medical sources when the claimant gives the ALJ permission to request the reports. 20 C.F.R. § 416.912(d). After reviewing the evidence, the ALJ is to make findings about what the evidence shows. 20 C.F.R. § 416.920b. However, if the evidence in the case record is insufficient[7] or inconsistent,[8] the ALJ may need to take additional actions. *Id.* "If the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if after weighing the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency." 20 C.F.R. § 416.920b(c). The ALJ should resolve the inconsistency or insufficiency by using one or more of the following actions: (1) recontacting the claimant's treating physician, psychologist, or other medical source; (2) requesting additional existing records; (3) requesting that the claimant undergo a consultative examination at the agency's expense; or (4) asking the claimant or others for more information. *Id.*

---

[7] An ALJ should consider the evidence to be insufficient if it does not contain all the information necessary to make a decision. 20 C.F.R. § 416.920b.

[8] An ALJ should consider the evidence to be inconsistent when it conflicts with other evidence, contains an internal conflict, is ambiguous, or does not appear to be based on medically-acceptable clinical or laboratory diagnostic techniques. 20 C.F.R. § 416.920b. If the ALJ determines that the evidence is inconsistent, he should weigh the relevant evidence to determine if the record contains sufficient evidence to decide the issue of disability. 20 C.F.R. § 416.920b(b).

"Where the ALJ fails in his duty to fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant, the case should be remanded." *Marsh*, 632 F.2d at 300, citing *Cutler v. Weinberger*, 516 F.2d 1282 (2nd Cir. 1975); *Hess v. Secretary of Health, Education and Welfare*, 497 F.2d 837 (3rd Cir. 1974); *Hicks v. Mathews*, 424 F. Supp. 8 (D. Md. 1976). In *Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981), the court emphasized that remand was appropriate "where the administrative law judge fails diligently to explore all relevant facts especially in cases of uneducation, pro se claimants and where the absence of counsel appears to prejudice a claimant."

Plaintiff appeared for two hearings. *See* Tr. at 23–48, 49–104. During the hearing on January 28, 2013, Plaintiff requested that he be granted a continuance to obtain an attorney and acquire additional records. Tr. at 52, 53, 54, 56. The ALJ thoroughly explained to Plaintiff how to go about retaining an attorney and informed him that he could do so without incurring any up-front charges. *See* Tr. at 61, 65–85, 95–98. He explained to Plaintiff how to complete the forms so that the agency could request his medical records. Tr. at 88–89. He informed Plaintiff that he would receive notice of a rescheduled hearing and that he would be required to appear with or without a representative. Tr. at 92. However, he stated that he would grant a further postponement to Plaintiff's representative if the representative requested additional time to prepare. Tr. at 94–95.

During the hearing on May 30, 2013, Plaintiff explained to the ALJ that he had contacted a law firm, but had been informed the Friday before the hearing that its

attorneys would be unable to represent him. Tr. at 26. He stated that he had contacted another attorney, but was unable to meet with him before the hearing because of a dental visit. Tr. at 27. He indicated he would be meeting with the attorney that afternoon. *Id.* He further indicated that his physician was referring him to an orthopaedist based on recent findings. *Id.* The ALJ stated he was proceeding with the hearing. Tr. at 28. After the ALJ took testimony from Plaintiff and the VE, he informed Plaintiff that he should tell the attorney he would be meeting with that afternoon "that if you want to appeal this and have him represent you, or if you would like to reapply based on the evidence that you obtain when you have these examinations, be more than happy to see both of you at that time." Tr. at 44–45. Plaintiff stated that he did not understand what the ALJ was saying. Tr. at 45. After excusing the VE, the ALJ explained to Plaintiff that he was denying his claim for benefits. *Id.* He indicated that if Plaintiff had found a representative, the representative could have requested a continuance to obtain the additional records from the orthopaedist and that he would have granted a postponement based on the representative's assertion that Plaintiff's case was "worthy of consideration and my representation." *Id.* Plaintiff stated that he assumed that the hearing was going to be postponed until after he retained an attorney. Tr. at 46. The ALJ informed Plaintiff that he was incorrect and stated "[y]ou've had some problems understanding." *Id.* Plaintiff stated he thought that the ALJ would postpone the hearing until after he visited the orthopaedist. *Id.* The ALJ indicated that was not his intention. *Id.* Plaintiff stated he thought the hearing would be postponed "because I told you I wanted to see an attorney." Tr. at 47. The ALJ

indicated to Plaintiff that he could speak with an attorney and that the decision would give him instructions on how to file an appeal. *Id.*

The ALJ's actions suggest that Plaintiff was not given a full and fair hearing on his claim. The ALJ specifically indicated to Plaintiff that he would be inclined to grant a continuance to an attorney to secure the additional evidence, but was unwilling to grant him the continuance because he was unrepresented. *See* Tr. at 45, 94–95. Although the undersigned recognizes the need for expediency in the administrative process, it does not excuse the fact that the ALJ explicitly informed Plaintiff that he would not be extended the same courtesy that would be extended to an attorney. Furthermore, the ALJ's concern that he did not "know how long it's going to take to set that up" could have been resolved by the ALJ referring Plaintiff for an orthopaedic consultative examination, which would have allowed the SSA to control the timeline. *See* 20 C.F.R. § 416.920b(c)(3). While the fact that the ALJ required the Plaintiff to proceed pro se is not grounds for remand in and of itself, the undersigned cannot recommend the court find the absence of counsel created no prejudice where the ALJ explicitly informed Plaintiff that he was being given lesser consideration because he was unrepresented. *See Sims v. Harris*, 631 F.2d 26, 27–28 (4th Cir. 1980) ("While lack of representation by counsel is not itself an indication that a hearing was not full and fair, it is settled that where the absence of counsel created clear prejudice or unfairness to the claimant, a remand is proper."); *Perrotta ex rel. S. J. P. v. Astrue*, No. 2:10-627, 2012 WL 503042, at *7 (E.D. Va. Jan. 18, 2012).

In addition, the record suggests that the ALJ should have taken special account of impairments that effectively disabled Plaintiff from substantiating his claim. *See*

28

*Cullison*, 613 F.2d at 58. Observations in the record and Plaintiff's testimonial declarations suggested that Plaintiff had difficulty understanding his medical conditions and the hearing process. Treatment records from Palmetto Health Richland Family Medicine Center include a notation of schizophrenia in Plaintiff's past medical history. Tr. 360. The discharge summary from Plaintiff's hospitalization from July 28 to August 5, 2010, indicated that Plaintiff "did not have an adequate understanding of the situation or the procedure, even after multiple attempts of explanation." Tr. at 297–98. J. Cruz, an employee of the SSA, interviewed Plaintiff in connection with his claim for benefits on November 2, 2010, and observed that he had difficulty concentrating and answering questions. Tr. at 189. Plaintiff alleged in a disability report that he sustained brain damage as a result of a carjacking in February 2010 and that he had memory loss. Tr. at 206. Plaintiff informed the ALJ several times during the two hearings that he did not understand the hearing process. Tr. at 46, 52, 53, 55, 56, 57. The ALJ even acknowledged that Plaintiff had difficulty understanding. Tr. at 46. Despite this evidence of record and the ALJ's acknowledgment of Plaintiff's difficulty understanding the hearing process, the ALJ took no actions to develop the record with respect to Plaintiff's mental functional abilities. Therefore, the undersigned recommends the court find the ALJ erred in failing to pursue one or several of the actions in 20 C.F.R. § 416.920b(c) to resolve the insufficiency in the evidence regarding Plaintiff's mental functional abilities.

Furthermore, it appears that the ALJ did not make every reasonable effort to help Plaintiff obtain his medical records. *See* 20 C.F.R. § 416.912(d). The last medical treatment visit note in the record prior to the hearing was dated March 8, 2012, which

was more than 14 months before the hearing. *See* Tr. at 421–22. Plaintiff informed the ALJ that he had seen his physician more recently, and the physician's opinion statements were completed approximately five months after the last treatment visit of record. *See* Tr. at 27, 462–62. Thus, the ALJ had constructive notice that Plaintiff received treatment after March 8, 2012, but took no steps[9] to obtain Plaintiff's most recent medical records.

In light of the foregoing, the undersigned recommends the court find the ALJ failed to effectively discharge his duty to develop the record where Plaintiff lacked the ability to substantiate his claim on his own and was denied a continuance to obtain legal counsel.

### 3.    Substantial Evidence

Plaintiff argues that he has problems with his head, hands, shoulders, feet, and legs that resulted from a carjacking in 2005. [ECF No. 47 at 1]. He maintains that he has high blood pressure and difficulty dealing with stress. *Id.* He contends that he has difficulty sleeping, has fallen several times, and experiences side effects from his medications that include sleepiness, agitation, and rash. *Id.* He argues the ALJ did not adequately consider his impairments. *Id.* at 1–2.

The Commissioner argues that substantial evidence supported the ALJ's determination that Plaintiff could work and was not disabled under the Social Security

---

[9] During the first hearing, the ALJ informed Plaintiff that the SSA would request his records if he properly listed his medical providers on their form. Tr. at 87–89. It is unclear from the record whether Plaintiff completed the form for the SSA to request his updated records. However, the ALJ did not extend the offer to obtain additional records at the second hearing and informed Plaintiff that he was denying his claim for benefits without making any effort to obtain the most recent treatment notes. Tr. at 45.

Act. [ECF No. 48 at 15]. She maintains that the ALJ's RFC assessment was supported by the opinions of the state agency consultants. *Id.* at 16. She contends the ALJ cited substantial evidence to support his credibility assessment. *Id.* at 16–19. She argues the ALJ properly assessed the medical opinions of record. *Id.* at 19–21.

"In evaluating whether or not the ALJ's ultimate conclusion is supported by substantial evidence, this court can do no more than require that the ALJ carefully consider the evidence, make reasonable and supportable choices and explain his conclusions." *McCall v. Apfel*, 27 F. Supp. 2d 723, 731 (S.D.W.Va. 1999). "[T]he Commissioner, not the court, is charged with resolving conflicts in the evidence." *Belcher v. Apfel*, 56 F. Supp. 2d 662, 665 (S.D.W.Va. 1999).  However, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Id.*, citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

In failing to properly discharge his duty to develop the record, the ALJ neglected to carefully consider the evidence. Despite evidence that suggested Plaintiff had some mental limitations, the ALJ assessed no mental impairments and included no mental limitations in the RFC assessment. *See* Tr. at 10, 15. Although the ALJ assessed episodic hand numbness as a severe impairment, his RFC assessment includes no limitation with regard to Plaintiff's use of his hands. While the ALJ provided reasons for discounting Plaintiff's physician's opinion and for the RFC he assessed, it is possible that the approximately 14 months of missing medical records, an orthopaedic examination, or additional development regarding Plaintiff's mental functional abilities may render his

31

conclusions unsupported. Therefore, the undersigned recommends the court find the ALJ's decision was not supported by substantial evidence.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

March 22, 2016                                           Shiva V. Hodges
Columbia, South Carolina                      United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).